Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 6260 | DATE | AUG 2 3 2000 |
| CASE TITLE | Cecil Watson vs. William Henderson | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, the Defendant's Motion for Summary Judgment is GRANTED. This case is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 2 5 2000 date docketed | 32 |
| X | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | ED-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 AUG 25 PM 12: 37 | | |
| MEA (lc) | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CECIL WATSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 99 C 6260 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| WILLIAM HENDERSON, Postmaster General of the United States, | ) |
| | ) |
| Defendant. | ) |

**DOCKETED AUG 2 5 2000**

## MEMORANDUM OPINION AND ORDER

Before this court is defendant Postmaster General of the United States' ("defendant") motion for summary judgment of plaintiff Cecil Watson's ("plaintiff" or "Watson") claims of race discrimination and retaliation brought under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. For the following reasons, the defendant's motion is GRANTED.

### Statement of Facts

Cecil Watson, a pro se plaintiff and an African-American male, brings race discrimination and retaliation claims against the defendant based upon four different incidents that occurred at the United States Post Office in Addison, Illinois (the "Addison facility"). The first incident includes an occurrence where Watson's supervisor, Annie Adams ("Adams"), required Watson to supervise two delivery units alone on April 14 and April 17, 1995. (Dft's 56.1(a)(3) Stmt. ¶ 13). The second incident was Adams' denial of Watson's request for leave on June 17, 1995. (Dft's 56.1(a)(3) Stmt. ¶ 45). The third incident was when Alexander Perchorowicz ("Perchorowicz"), Manager of Post Office Operations, and William Theriault ("Theriault"), Acting Manager, required Watson to attend

1

32

a five-day training course from June 19 to June 23, 1995. (Dft's 56.1(a)(3) Stmt. ¶ 57). The final incident occurred when the U.S. Postal Service's Human Resources Department required Watson to attend a two-day training course on September 26 and 27, 1995. (Dft's 56.1(a)(3) Stmt. ¶ 58).

**The April 14th and 17th Incidents**

In 1995, Watson was a delivery unit supervisor and was responsible for supervising one of two delivery units at the Addison facility. (Dft's 56.1(a)(3) Stmt. ¶ 3). When he started at the Addison facility in 1993, Watson supervised both delivery units himself, but by 1995 another delivery unit supervisor, Janet Hopkins ("Hopkins"), an African-American woman, was responsible for the other delivery unit. (Dft's 56.1(a)(3) Stmt. ¶¶ 19, 20). Their supervisor was Annie Adams, the Postmaster for the Addison facility. (Dft's 56.1(a)(3) Stmt. ¶ 4). As a delivery unit supervisor, Watson was to ensure that there was a mail carrier for each delivery unit, to sort first and second class mail, and to assess the volume of mail received for delivery in order to determine whether additional assistance would be necessary to deliver the mail. (Dft's 56.1(a)(3) Stmt. ¶¶ 21, 22, 23, 24). The Addison facility also had two substitute supervisors (commonly referred to as "204-B supervisors") who filled in for Hopkins and Watson on their days off: Yolanda Rader ("Rader"), an African-American woman, and Mike Gluecklich ("Gluecklich"), a Caucasian man. (Dft's 56.1(a)(3) Stmt. ¶ 25).

On April 14 and April 17, 1995, Hopkins was on annual leave. (Dft's 56.1(a)(3) Stmt. ¶ 27). Rader was not working at the Addison facility that April, for she had been detailed to the Bensenville Post Office. (Dft's 56.1(a)(3) Stmt. ¶ 26). Since seven mail carriers did not report to work on the 14th (four of them were on annual leave and three were on sick leave), Gluecklich was assigned to deliver mail. (Dft's 56.1(a)(3) ¶¶ 30, 31). Therefore, on April 14, 1995, Adams instructed Watson

to supervise both delivery units alone. (Dft's 56.1(a)(3) Stmt. ¶ 28). The same situation occurred on April 17, 1995. On that day, ten carriers did not report to work and Gluecklich was on sick leave. (Dft's 56.1(a)(3) Stmt. ¶¶ 33, 34). Once again, Adams assigned Watson to supervise both delivery units. (Dft's 56.1(a)(3) Stmt. 32).

Watson asserts that Adams has never instructed any other supervisor to supervise two units at the same time. To support this assertion, Watson presents the declarations of four present and past supervisors from the Addison facility: Gina Colburn-Sourek (a Caucasian woman), Jeffrey Chaney (a Caucasian man), Roderick Madridejos (an Asian-American man), as well as Gluecklich. (Pl's Exs. 6, 7, 8, 9). Each of these declarations state that during their time as supervisors at the Addison facility, Adams never instructed them to supervise both the delivery units. (Id.). In response to this evidence, the defendant presents declarations from the exact same individuals that state, "In providing [the declaration to Watson], my intention was not to give the impression that I never supervised both delivery units by myself. . . . While Postmaster Annie Adams did not physically 'instruct' me to supervise both delivery units alone, it was common knowledge to supervise both units if you were the only supervisor on duty." (Dft's Ex. 27). Each of these declarations presented by the defendants also state that each individual has supervised both delivery units by themselves on various occasions when they were the only delivery supervisor present. (Id.).

**Denial of June 17th Leave**

In June of 1995, Watson's regularly scheduled days off were Saturday and Tuesday. (Dft's 56.1(a)(3) Stmt. ¶ 46). Watson was scheduled to attend a supervisory training Monday, June 19th through Friday, June 23rd, 1995. (Dft's 56.1(a)(3) Stmt. ¶ 47). Since he was scheduled to attend a training on his day off, Watson requested to have his day off switched from Tuesday, June 20th

3

to Saturday, June 17th. (Dft's 56.1(a)(3) Stmt. ¶ 48). However, it is unclear when Watson made this request.

Watson testified in his deposition that it was regular policy and practice that if an employee was scheduled to have a training during one of his or her regularly scheduled days off, then the employee would have the previous Saturday off instead. (Dft's Ex. 3, pp. 53-54). Watson never requested June 17th off in writing and does not recall discussing with Adams having June 17th off until Friday, June 16th. (Dft's 56.1(a)(3) Stmt. ¶¶ 49-51, Dft's Ex. 3, pp. 53-54). In that June 16th conversation, Adams denied Watson's request, stating that Hopkins was on annual leave that day, and Rader and Gluecklich were off that day, along with seven other mail carriers. (Dft's 56.1(a)(3) Stmt. ¶¶ 52, 53; Dft's Ex. 3, pp. 57-58; Dft's Ex. 5 ¶ 15). Watson was paid overtime for the Tuesday he had to attend the training. (Dft's 56.1(a)(3) Stmt. ¶ 56).

**Trainings on June 19-23, 1995, and September 26-27, 1995**

Sometime before February, 1995, a distribution clerk at the Oak Park Post Office, Robert Houlihan ("Houlihan") filed a race discrimination claim against the Postal Service and identified Watson as his supervisor who discriminated against him. (Dft's 56.1(a)(3) Stmt. ¶ 59). As part of the settlement agreement with Houlihan entered on April 19, 1995, Watson was required to attend two training courses available at the time of the settlement, the Supervisory Administrative Basics and Communication Skills Training. (Dft's 56.1(a)(3) Stmt. ¶ 68). Alexander Perchorowicz, Manager of Post Office Relations, and William Theriault, Acting Manager, approved the settlement agreement. (Id.). Watson's working conditions, such as his title, job responsibilities, pay or working hours, were not affected by his attendance to these trainings. (Dft's 56.1(a)(3) Stmt. ¶¶ 70, 71).

Based upon the above incidents, Watson filed both informal and formal complaints of race

4

discrimination and retaliation. (Dft's 56.1(a)(3) Stmt. ¶¶ 72-76). In those complaints, Watson alleged that these incidents were in retaliation to a race discrimination complaint he had filed against the defendant previously, a complaint that was resolved in a bench trial in front of this court in 1998. (Dft's 56.1(a)(3) 73; Cecil Watson v. Marvin Runyon, Postmaster General, No. 96 C 7044, Memorandum Opinion and Order, September 16, 1998; *rev'd and remanded*, 2000 WL 1010849 (7th Cir. July 24, 2000). In the present complaint, Watson requested a hearing before the EEOC and Administrative Law Judge Damien Lee found no discrimination nor retaliation by the defendant. (Dft's 56.1(a)(3) Stmt. ¶¶ 83, 84). Watson then filed this present action.

### Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter if law." Fed.R.Civ.P. 56(c); Cox v. Acme Health Serv., Inc., 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial when, after viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co, 47 F.3d 928, 931 (7th Cir. 1995). The party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg, 47 F.3d at 931. If this burden is met by the movant, the non-movant must then set forth specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324. While affidavits, depositions and interrogatories are acceptable evidence for the non-movant to present, these are not the exclusive forms of evidence that can be used in

responding to summary judgment. Wright, Miller & Kane Federal Practice and Procedure: Civil 3d § 2721. In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non-movant. Cuddington v. Northern Ind. Public Serv. Co., 33 F.3d 813, 815 (7th Cir. 1994). However, Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion: "there must be evidence on which they jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

**Analysis**

Title VII makes it unlawful for an employer to discriminate against an employee because of the employee's race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff can satisfy his burden of proof in a race discrimination case in two ways: through direct evidence of discriminatory intent or through indirect evidence demonstrated by the burden-shifting method presented in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 516 (7th Cir. 1996); Von Zuckerstein v. Argonne Nat'l Lab., 984 F.2d 1467, 1472 (7th Cir. 1993). In the present case, Watson does not present direct evidence of discrimination, and thus the court turns to the burden-shifting method of McDonnell-Douglas.

The first step for Watson under the McDonnell-Douglas method is to establish a prima facie case of race discrimination. Gonzalez, 133 F.3d at 1032; Pasqua, 101 F.3d at 516. To establish a prima facie case of racial discrimination, the plaintiff must show that he is (1) in a protected class; (2) performing his job satisfactorily; (3) the subject of a materially adverse employment action; and

(4) similarly situated employees outside the protected class were treated more favorably. Oates v. Discovery Zone, 116 F.3d 1161, 1171 (7th Cir. 1997); Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. Cowan v. Glenbrook Sec. Servs., Inc., 123 F.3d 438, 445 (7th Cir. 1997). Then the burden shifts back to the plaintiff to show the defendant's reason is in fact pretext for discrimination. Bahl v. Royal Indemnity Co., 115 F.3d 1283, 1290 (7th Cir. 1997). The ultimate burden of proof remains with the plaintiff at all times. See Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994).

In order for Watson to avoid summary judgment on his retaliation claims, he must go through the same McDonnell-Douglas burden shifting test of prima facie case, legitimate nondiscriminatory reason of employer, and pretext. To establish a prima facie case of retaliation, he must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action by the defendant; and (3) there is a causal link between his protected expression and the adverse action. McKenzie v. Illinois Department of Transportation, 92 F.3d 473, 483 (7th Cir. 1996), citing Brenner v. Brown, 36 F.3d 18, 19 (7th Cir. 1994) and Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir. 1992). In order to establish the "causal link," the plaintiff must show that the defendant would not have done the adverse action "but for" his previous filing of a complaint with the EEOC. McKenzie, 92 F.3d at 483.

Watson has filed claims of race discrimination and retaliation for each of the four incidents, so each will be discussed in turn.

**The April 14th and 17th Incidents**

The defendant argues that Watson has not established a prima facie case of race

7

discrimination based on the April 14th and 17th incidents, for Watson did not suffer an adverse employment action nor were similarly situated employees treated differently than Watson. (Dft's Mem. of Law, p. 4). Watson argues that being instructed by Adams to supervise both delivery units instead of one was an adverse employment action, for "Ms. Adams had several choices to provide a replacement for Delivery Supervisor Janet Hopkin's position. ..." (Pl's Resp., p. 6). Watson also baldly asserts that Adams knew that Watson had taken leave from January through October of 1994 because of stressed related to performing duties of more than one supervisor. (Pl's Resp., p. 6). Neither of Watson's reasons are supported by the evidence before this court. The evidence presented shows that the normal substitute supervisors for Hopkins were detained on other assignments or were on sick leave on the days in question. (Dft's 56.1(a)(3) Stmt. ¶¶ 26, 30, 31, 33, 34). As to whether Adams knew that Watson had supposedly taken leave for stress the year before, Watson presents absolutely no evidence to support such an assertion. Finally, a short-term change in a daily assignment is not an adverse job action. While the definition for an adverse job action is quite broad, see McConnell v. Cisneros, 84 F.3d 256, 258-59 (7th Cir. 1996), the Seventh Circuit has held that an adverse employment action is indicated by a termination of employment, a demotion evidenced by a decrease in wages or salary, a less distinguished title, a material loss of benefits, or significant diminished responsibilities. Dey v. Colt Construction and Development Co., 28 F.3d 1446 (7th Cir. 1994). If anything, Watson had an increase in job responsibility for the days in question. Minor changes in the routine for one day does not rise to the level of adverse employment action. Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996).

Watson also has not shown that similarly situated employees were treated differently. Granted, Watson does present the declaration of four delivery unit supervisors saying they were

never instructed by Adams to supervise both delivery units at once. However, the defendants present declarations for the same individuals clarifying their statements and stating that they had supervised both units if they were the only supervisor on duty, as was the situation with Watson on April 14 and 17 of 1995.

Even if Watson had established a prima facie case of race discrimination, the defendant has provided a legitimate non-discriminatory reason for having Watson supervise two units on April 14 and 17 of 1995. The defendant presents evidence that there were absences on those two days and the substitute supervisors were not available to work on those days. The defendant also presents evidence that if there was only one supervisor on duty, that supervisor supervised both units. (Dft's Ex. 27). Watson has not provided any evidence that these reasons were pretext for discrimination. Therefore, Watson has not met his burden to avoid summary judgment on this race discrimination claim.

As to Watson's retaliation claim, Watson has not established a prima facie case. Watson did engage in a statutorily protected activity, by filing an EEOC complaint against the defendant in 1990. However, as discussed above, Watson did not suffer an adverse employment action on April 14 and 17, 1995. Also, there was not a causal link between Watson's protected expression and the so-called adverse action. "The temporal proximity of [the plaintiff] filing and the [adverse action], standing by itself, does not sufficiently raise the inference that [the plaintiff's] filing was the reason for the adverse action." Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th Cir. 1992). Besides the fact that Watson had filed an EEOC complaint against the defendant that was still pending at the time, there is nothing to tie the actions of Adams on April 14 and 17, 1995 to Watson's filing of the complaint. Therefore, Watson has not shown that Adams would not have made him supervise two

units "but for" his filing of an EEOC complaint five years prior. McKenzie, 92 F.3d at 483.

**Denial of June 17th Leave**

Watson has not established a prima facie case for either a race discrimination claim or a retaliation claim as to his denial of leave on June 17, 1995. First, Watson has not shown that similarly situated employees were given permission to switch their days off because of trainings scheduled on their day-off. Watson does assert that it was policy and practice of the defendant to do such switching, but presents no evidence to support such an assertion. Second, similar to the April 14 and 17, 1995 incidents, Watson does not present any evidence connecting Adams' actions to his filing of his EEOC complaint.

For argument's sake, if Watson had established a prima facie case for both a race discrimination claim and a retaliation claim, the defendant has provided a legitimate nondiscriminatory reason for Adams' denial of Watson's leave request and Watson has not shown that the reason was pretextual. First, Watson did not request leave until the day before, on Friday, June 16th. Second, the other delivery supervisor, Hopkins, was not going to be working on June 17th and neither were either of the substitute supervisors. Thus, if Adams had granted Watson's request for leave, there would have been no supervisor on duty that day. Watson argues that Adams had other options she could have exercised, yet does not cite any evidence to support his speculation. (Pl's Resp., pp. 6-7). Speculation as to whether the defendant had other options besides her decided upon action does not create a general issue of fact. Sanchez v. Henderson, 188 F.3d 740, 747 (7th Cir. 1999).

**Trainings on June 19-23, 1995, and September 26-27, 1995**

Once again, Watson is not able to establish a prima facie case for either race discrimination

10

or retaliation. In his original complaint, Watson alleged that his required attendance at the June and September trainings adversely affected his monetary compensation, benefits, and title of his position. (Complaint, pp. 1-5). However, the evidence now before this court does not show that Watson's required attendance at these trainings had any adverse employment effects upon him. In fact, Watson was paid overtime for one of the days he attended the training, since it was scheduled on one of his off days. (Dft's 56.1(a)(3) ¶ 56).

Also, the defendant had a legitimate nondiscriminatory reason for requiring Watson to attend the two trainings. As part of a settlement agreement on a race discrimination claim against Watson himself, the defendant agreed to have Watson attend the two training courses available at the time of the settlement. (Dft's 56.1(a)(3) Stmt. ¶ 68). Settlements of a Title VII claim may not be considered independent acts of discrimination as a matter of law, unless there are allegations of bad faith in making the agreement. Green v. Runyon, 1996 WL 65989, *4 (N.D.Ill.), citing EEOC v. McCall Printing Corp., 633 .2d 1232 (6th Cir. 1980) and Carey v. United States Postal Service, 812 F.2d 621 (10th Cir. 1987). Watson does not argue nor presents any evidence of bad faith in the settlement of Houlihan's complaint. Therefore, the defendant has presented a legitimate nondiscriminatory reason for requiring Watson to attend the training and Watson has not shown that this reason was pretext for race discrimination or retaliation.

## Conclusion

For the foregoing reasons, defendant Postmaster General of the United States' motion for summary judgment of plaintiff Cecil Watson's claims of race discrimination and retaliation brought under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., is GRANTED.

Enter:

_David H. Coar_
David H. Coar
United States District Judge

Dated: **AUG 2 3 2000**